# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| JOHN MEZZALINGUA ASSOCIATES, INC. (d/b/a PPC), a Delaware corporation, | Case No: 0:10-cv-00064 MJD/JJG |
| Plaintiff, | |
| vs. | |
| PACE ELECTRONICS, INC. (d/b/a PACE INTERNATIONAL), a Minnesota corporation,  and PERFECT 10 ANTENNA COMPANY, an Arkansas corporation, | |
| Defendants. | |
| PACE ELECTRONICS, INC. (d/b/a PACE INTERNATIONAL), a Minnesota corporation and PERFECT 10 ANTENNA COMPANY, an Arkansas corporation, | |
| Counterclaim Plaintiff, | |
| vs. | |
| JOHN MEZZALINGUA ASSOCIATES, INC. (d/b/a PPC), a Delaware corporation, | |
| Counterclaim Defendant. | |

## PPC'S MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ...........................................................................1

II.   BOTH THE LAW AND THE FACTS PRECLUDE SUMMARY
      JUDGMENT ON THE ISSUE OF PATENT INFRINGEMENT .................2

      A.    The Interpretation For The Shape Of The "Band" Argued By
            Defendants Is Incorrect, And Therefore Their Assertion of Non-
            Infringement Is Incorrect As Well .......................................5

            1.    The Proper Construction of "Band" Does Not Require A
                  Thickness of Material In The Radial Dimension That Is
                  Greater Than The Width In The Axial Dimension ....................5

                  a)    The Plain and Ordinary Meaning of "Band" Does
                        Not Require A Thickness Of Material In The
                        Radial Dimension Greater Than The Width In The
                        Axial Dimension ............................................10

                  b)    All Embodiments Disclosed In The Specification
                        Have "Bands" With Thicknesses Of Material In
                        The Radial Dimension That Are Less Than—Not
                        Greater Than—Their Widths In The Axial
                        Dimension .....................................................11

                  c)    Additional Portions of the Specification, As Well
                        As The Prosecution History, Demonstrate That
                        The Interpretation Argued By Defendants Is
                        Incorrect ......................................................15

            2.    Even Under Defendants' Stated Interpretation For The
                  Shape Of The "Band," There Is Literal Infringement .............18

      B.    The Presence Of A Small Protrusion On The Edge of
            Defendants' Band Does Not Demonstrate Non-Infringement,
            Let Alone Justify Summary Judgment Of Non-Infringement ...........19

III.   SUMMARY JUDGMENT IN FAVOR OF DEFENDANTS ON THE
       ISSUE OF TRADE DRESS INFRINGEMENT WOULD BE
       IMPROPER ....................................................................................22

       A.   The '194 Patent Is Not Evidence Of Functional Trade Dress
            Because The '194 Patent Is Directed To Structure That Is Inside
            The Connector ......................................................................26

       B.   Evidence Of Record Establishes That The EX Trade Dress Is
            Not Functional......................................................................32

       C.   Because Defendants Have Withheld Evidence Relevant To The
            Issue Of Functionality, Summary Judgment Should Be Denied ........36

IV.    DEFENDANTS' MOTION IS PREMATURE, AND PPC
       REQUESTS RELIEF UNDER FED.R.CIV.P. 56(f) ....................................37

V.     CONCLUSION...............................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Aromatique, Inc. v. Gold Seal, Inc.*,
  28 F.3d 863 (8th Cir. 1994) ........................................................................22

*Asics Corp. v. Target Corp.*,
  282 F. Supp. 2d 1020 (D. Minn. 2003) .......................................................27

*Berlin Packaging, LLC. v. Stull Techs, Inc.*,
  381 F. Supp. 2d 792 (N.D. Ill. 2004)...........................................................27

*City of Rome v. U.S.*,
  450 F.Supp. 378 (D.C. D.C. 1978) ..............................................................39

*Ellipse Corp. v. Ford Motor Co.*,
  452 F.2d 163 (7th Cir. 1971) .........................................................................9

*Franek v. Walmart Stores, Inc.*,
  2009 U.S. Dist. LEXIS 20361 (N.D. Ill. 2009)...........................................27

*Gateway, Inc. v. Champion Prods., Inc.*,
  384 F.3d 503 (8th Cir. 2004) .......................................................................36

*In re Paulsen*,
  30 F.3d 1475 (Fed. Cir. 1994) ............................................................... 6, 14

*In re TMJ Implants Prods. Liab. Litig.*,
  113 F.3d 1484 (8th Cir. 1997) .....................................................................38

*Johns Hopkins University v. Cellpro, Inc.*,
  152 F.3d 1342 (Fed. Cir. 1998) ............................................................. 5, 15

*K-2 Corp. v. Salomon S.A.*,
  191 F.3d 1356 (Fed. Cir. 1999) ...................................................................17

*Lear Siegler, Inc. v. Aeroquip Corp.*,
  733 F.2d 881 (Fed. Cir. 1984) .......................................................................8

*Leviton Mfg. v. Universal Sec. Inst., Inc.*,
    304 F. Supp. 2d 726 (D. Ma. 4004) ...............................................................27

*Markman v. Westview Instruments, Inc.*,
    52 F.3d 967 (Fed. Cir. 1995) .........................................................................6

*Merck & Co. v. Teva Pharmaceuticals USA*,
    395 F.3d 1364 (Fed. Cir. 2005) ....................................................................17

*Nolan v. Thompson*,
    521 F.3d 983 (8th Cir. 2008) ........................................................................38

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ........................................................ 6, 10, 19

*Rainbow Play Sys. Inc. v. Groundscape Tech.*, LLC.,
    364 F. Supp. 2d 1026 (D. Minn. 2005) .........................................................33

*Robinson v. Terex Corp.*,
    439 F.3d 465 (8th Cir. 2008) ........................................................................38

*Stanback v. Best Diversified Prods., Inc.*,
    180 F.3d 903 (8th Cir. 1999) ................................................................. 38, 39

*TafFix Devices, Inc. v. Marketing Displays, Inc.*,
    532 U.S. 23, 121 S.Ct.1255, 149 L.Ed.2d 164 (2001) .................... 26, 27, 32

*Two Pesos, Inc. v. Taco Cabana, Inc.*,
    505 U.S. 763, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992) ...............................23

*United States v. Casino Magic Corp*,
    293 F3d 419 (8th Cir. 2002) .........................................................................39

*University v. Cellpro, Inc.*,
    152 F.3d 1342 (Fed. Cir. 1998) ............................................................... 5, 15

*Valu Engineering v. Rexnard Corp.*,
    278 F3d 1268 (Fed. Cir. 2002) .....................................................................34

## **STATUTES**

Federal Rule of Civil Procedure 56 .......................................................................39

## <u>OTHER AUTHORITIES</u>

*American Heritage Dictionary of the English Language* (4th ed. 2000) ... 10, 20, 21

*Merriam-Websters Collegiate Dictionary* (10th ed. 1998)............................. 20, 21

*Random House Webster's College Dictionary* (2d ed. 1997)......................... 11, 21

*The Oxford American Desk Dictionary* (1998).........................................................11

*Webster's New World Dictionary and Thesaurus* (2d ed. 2002)...................... 11, 21

## I.    INTRODUCTION

Even though defendants Pace Electronics, Inc., d/b/a Pace International ("Pace") and Perfect 10 Antenna Company ("Perfect 10") (collectively herein "Defendants") have not completed their document production or permitted deposition testimony of any witness they still contend that no disputed material fact exists to prevent the Court from entering summary judgment on every claim raised in the complaint.  More specifically, Defendants contend that a finding of non-infringement is appropriate without allowing Plaintiff John Mezzalingua Associates, Inc., d/b/a PPC ("PPC") discovery on the accused devices or allowing the Court to complete claim construction.  Defendants also contend that summary judgment on trade dress is appropriate even though it has not permitted discovery on their willful copying of PPC's trade dress or alternative connector designs. As articulated in the arguments below, a multitude of factual disputes exist that preclude entry of summary judgment, not the least of  which is recently discovered evidence that Defendant Perfect 10 has sold redesigned cable connectors to DIRECTV that even more closely copy the appearance of PPC's trade dress. This evidence (independently obtained by PPC just two days ago) directly contradicts the declaration of Defendant Perfect 10's President, Robert Chastain.  For this reason alone, granting summary judgment at this time is premature and inappropriate.

Notwithstanding the many disputed facts that preclude summary judgment, PPC has addressed Defendants' arguments on their merits.  Although Defendants moved for summary judgment without presenting any claim construction arguments, PPC has addressed the parties' competing claim constructions of terms raised in Defendants' motion.  Specifically, PPC has shown that Defendants' proposed constructions are strained, are not supported by the patent specification, and do not comport with the understanding of those of skill in the art.  More importantly, Defendants propose a claim construction for "elastomeric band" that does not cover any of the disclosed embodiments.  Defendants' trade dress argument seeks a determination of functionality based on the existence of one utility patent.  Inexplicably, Defendants fail to employ (or even recognize) the test for assessing functionality of trade dress in light of a utility patent.  As PPC has established below, if Defendants had applied the test for such a determination, their argument would fail.  In support of its trade dress claim, PPC has submitted evidence, in the form of sworn declarations, that its trade dress is non-functional. For these reasons, PPC submits that the present motion can also be denied on the merits presented below.

## II.  BOTH THE LAW AND THE FACTS PRECLUDE SUMMARY JUDGMENT ON THE ISSUE OF PATENT INFRINGEMENT

To understand Defendants' arguments, it is important to understand Defendants' accused product.  Inside Defendants' cable connector is an

2

"elastomeric band," just as the claims of PPC's '416 patent require. Conspicuously absent from Defendants' brief is a photograph of that band. But here is an enlarged photograph:



(Declaration of Charles Eldering In Support Of PPC's Memorandum of Law In Opposition To Defendants' Motion for Summary Judgment (hereinafter "Eldering Decl."), ¶ 6).

Despite the fact that even a lay person would know that this structure qualifies as a "band," Defendants argue otherwise. They make two arguments to assert non-infringement. First, Defendants argue that the proper interpretation of "band" requires an encircling strip with a thickness of material in the radial direction that is *greater* than the width in the axial direction.[1]   Defendants then

---

[1] An illustration showing a "radial" direction (along a radius) and an "axial" direction (along an axis) is reproduced below:

argue that there is no infringement because they use a band with a thickness of material in the radial direction that is *less* than the width in the axial direction. In other words, they assert that an "elastomeric band" must have the relative dimensions of a thin rubber washer, such as is pictured below:



The interpretation of "band" argued by Defendants is incorrect, and therefore their first non-infringement argument fails. Significantly, the interpretation argued by Defendants would cause the claims of the '416 patent to fail to encompass *any* of the embodiments disclosed in the patent, a result which is



"rarely, if ever, correct."   *Johns Hopkins University v. Cellpro, Inc.*, 152 F.3d 1342, 1355 (Fed. Cir. 1998) (overruled on other grounds).

Second, Defendants argue that the proper interpretation of "band" requires an encircling "flat strip."  Defendants then argue that they use a band that has a small structure protruding from its edge, and that the protrusion precludes the structure from being a "flat" strip.  The protrusion can be seen on the edge of the band in the enlarged photograph provided above.  On this issue, Defendants are reading too much into the word "flat," and at the very least are asking the Court to improperly resolve genuine issues of material fact.  Summary judgment of non-infringement is clearly inappropriate.

**A.    The Interpretation For The Shape Of The "Band" Argued By Defendants Is Incorrect, And Therefore Their Assertion of Non-Infringement Is Incorrect As Well**

**1.    The Proper Construction of "Band" Does Not Require A Thickness of Material In The Radial Dimension That Is Greater Than The Width In The Axial Dimension**

Defendants' first argument is that a "band" must have a thickness of material in the radial dimension that is greater than the width in the axial dimension. Defendants do not dispute that this definition is contrary to the plain and ordinary meaning of the term "band," but instead "assume" that the patentee here defined the term differently.  (D.Mem. 9).

Defendants' "assumed" interpretation is incorrect. Defendants provide no analysis, other than to invoke the doctrine that "a patentee is free to be his own lexicographer." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995) (*en banc*). In other words, "the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (*en banc*). However, Defendants fail to acknowledge or account for the limits on that doctrine: "The caveat is that any special definition given to a word must be clearly defined in the specification." *Markman*, 52 F.3d at 980. In other words, "[a]lthough an inventor is indeed free to define the specific terms used to describe his or her invention, this must be done with *reasonable clarity, deliberateness, and precision*." *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994) (emphasis added).

Here, Defendants rely on a single sentence in the specification to support their definition—indeed, a single word in the specification—and ignore the rest of the specification. Specifically, at one point, after referring to "elastomeric band 26" in Figure 1, the specification explains: "'Band' is used in the sense of a flat strip, i.e., the width is greater than the thickness." (Exh. A,[2] '416 patent, 2:40-41).

---

[2] Unless otherwise stated, all Exhibits referenced herein are attached as Exhibits to the Declaration of Robert E. Aycock in Support of PPC's

It then continues: "The 'length' would be the circumference of the band, with the *width* being in the radial direction."  (Exh. A, 2:41-43 (emphasis added)).  Of course, the first sentence is perfectly in accord with the plain and ordinary meaning of the term "band."  It is the word "width" in the second sentence on which Defendants rely.  When juxtaposed with the use of the word "width" in the first sentence, the use of the word "width" in the second sentence implies that the first sentence is defining a "band" to comprise a strip with a "width [in the radial dimension]" that is "greater than the thickness."

Defendants then apparently assume that if the word "width" in the first sentence refers to the radial dimension, then the word "thickness" in the first sentence must not refer to the radial dimension, but must instead refer to the axial dimension.  Defendants must further assume that the phrase "width…in the radial direction" refers only to the thickness of material measured along a radius of the encircling strip, rather than the entire radius itself.

With this series of inferences and assumptions, Defendants argue that the patentee has defined the term "band" contrary to its plain meaning to require a

---

Memorandum of Law In Opposition To Defendants' Motion for Summary Judgment (hereinafter "Aycock Decl."), filed concurrently herewith.

thickness of material in the radial dimension that is greater than the width in the axial dimension.[3]

The problem with Defendants' position is that there is a mountain of evidence and inferences in the specification and the prosecution history that points not only away from Defendants' proposed definition, but to the plain and ordinary meaning of the word "band."  Therefore, the isolated sentence and associated inferences on which Defendants rely does not provide the requisite "clarity, deliberateness, and precision" required to redefine the term "band" away from the meaning it would otherwise—and does—plainly possess.  As the case law recognizes, the requisite "clarity, deliberateness, and precision" is only present "[s]o long as the meaning of an expression is made reasonably clear and its use is *consistent within a patent disclosure*." *Lear Siegler, Inc. v. Aeroquip Corp.*, 733 F.2d 881, 889 (Fed. Cir. 1984) (emphasis added) (citing *Ellipse Corp. v. Ford*

---

[3] In response to PPC's motion for a preliminary injunction, Defendants argued that the fact that the first sentence includes the word "band" in quotation marks and uses the term "i.e." signals in intent to define.  (Dkt. No. 65, p. 15).  Even assuming, *argueondo*, that this is true, it must be remembered that the quotation marks and the term "i.e." are in the first sentence, not the second sentence.  Thus, use of the quotation marks at most signals an intent to define the term "band" as referring to an encircling "flat strip," and use of the term "i.e." signals an intent to define "flat strip" as having a width that is greater than its thickness.  That usage is fully in accord with a plain and ordinary meaning of the term "band."  The use of quotation marks and the term "i.e." *in the first sentence* has no bearing on whether the patentee intended *in the second sentence* to redefine the term "band" with an unconventional and counterintuitive meaning.

*Motor Co.*, 452 F.2d 163, 167 (7th Cir. 1971) ("A patentee can choose his own terms and use them as he wishes so long as he remains consistent in their use….")).

Additionally, an inventor of the '416 patent has testified that it was not the inventor's intention to ascribe a special meaning of band. (Declaration of Noah Montena in Support of PPC's Opposition to Defendants' Motion for Summary Judgment ("Motena Decl."), ¶¶ 3-5). It was his intention to claim an elastomeric band to comport with the general shape and dimensions shown if the Figures of the '416 patent. (*Id.*). He further testified that "band" was described as a flat strip with its width greater than its thickness to clarify that the "elastomeric band" of the '416 patent should not be an O-ring. (*Id.* at ¶ 6). There was no effort to define a "band" in any manner that did not comport with the common meaning of "band." (*Id.*).

The only plausible conclusion based on the rest of the patent's disclosure and the investor's intent is that use of the term "band" is clearly *not* limited to the definition now proposed by Defendants. Indeed, given the remainder of the patent specification, it would be apparent to even the most disinterested reader that use of the dimensional terms in the second sentence is not intended to counter the rest of the specification but is likely the result of the drafter's shift of perspective from viewing the band as a flat strip to viewing it in terms of as a circumferential unit.

9

We will now detail the evidence demonstrating that the interpretation argued by Defendants is incorrect.

> **a)   The Plain and Ordinary Meaning of "Band" Does Not Require A Thickness Of Material In The Radial Dimension Greater Than The Width In The Axial Dimension**

The first problem with the interpretation argued by Defendants is the plain and ordinary meaning of the term "band."  This term is not used in a technical sense; a lay person would understand that the word "band" encompasses the structure found in Defendants' devices.  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (*en banc*) ("In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words.").  Defendants do not dispute that their definition is at odds with the plain and ordinary meaning of the term.  If there were any need to confirm this, ordinary dictionaries all provide definitions of the word that squarely contemplate the shape that Defendants are trying to exclude from their definition:

- "1. A thin strip of flexible material used to encircle and bind one object or to hold a number of objects together: a metal band around the bale of cotton."  Exh. B, *American Heritage Dictionary of the English Language* (4th ed. 2000).

10

- "1. A thin, flat strip of some material, as for binding or trimming. 2. A fillet, belt or strap: a band for the hair."  Exh. C, *Random House Webster's College Dictionary* (2d ed. 1997).

- "1. Flat, thin strip or loop of material (e.g., paper, metal, or cloth) put around something esp. to hold or decorate it."  Exh. D, *The Oxford American Desk Dictionary* (1998).

- "1. Something that binds, ties, or encircles, as a strip or ring of wood, rubber, metal, etc."  Exh. E, *Webster's New World Dictionary and Thesaurus* (2d ed. 2002).

- "4. a thin flat encircling strip esp. for binding: as a: close-fitting strip that confines material at the waist, neck, or cuff of clothing…."  Exh. F, *Merriam-Webster's Collegiate Dictionary* (10th. ed. 1998).

It is clear from these definitions that the plain and ordinary meaning of the term "band" encompasses the band used in Defendants' accused devices. (Eldering Decl., ¶ 7; *see also*, Montena Decl., ¶ 5).  Therefore, in order to define the term "band" in a manner that differs from this conventional understanding, Defendants must demonstrate that the specification provides a different definition with "clarity, deliberateness, and precision."  *Paulsen*, 30 F.3d at 1480.  As demonstrated below, the specification does just the opposite.

                **b)**    **All Embodiments Disclosed In The Specification Have "Bands" With Thicknesses Of Material In The Radial Dimension That Are Less Than—Not Greater Than— Their Widths In The Axial Dimension**

All of the embodiments disclosed in the '416 patent have "bands" with thicknesses of material in the radial dimension that are less than—not greater than—their widths in the axial dimension.  The specification introduces the first

11

embodiment in Figure 1, stating that Figure 1 "shows a partial cutaway perspective view of a connector according to *an embodiment of the invention*."  (Exh. A, 2:7-8 (emphasis added)).    The specification then refers to element 26 as "[a]n elastomeric band."    (Exh. A, 2:38).    Figure 1 is reproduced below, with an unobstructed cutaway view of element 26 provided at the right of the Figure:



As can be seen in Figure 1, element 26 has a thickness of material in the radial dimension that is less than the width in the axial dimension, not greater. And the specification expressly refers to element 26 as an "elastomeric band" *at least ten times*.  (Exh. A, 2:3, 2:63, 2:66, 3:2, 3:5, 3:9, 3:14, 3:16, 3:18, 3:20).

The rest of the embodiments disclosed in the patent demonstrate the same thing.  The specification refers to Figure 4 as illustrating an "embodiment of the present invention."  (Exh. A, 3:40-41; *see also* Exh. A, 2:16).  The specification

also refers to Figure 7 as illustrating "an embodiment of the invention." (Exh. A, 2:24-25). The specification refers to element 26 in Figure 4 as "[a]n elastomeric band," and also refers to element 54 in Figure 7 as "an elastomeric band." Figures 4 and 7 are reproduced below, with unobstructed cutaway views of elements 26 and 54 provided at the right of the Figures:



As can be seen in Figures 4 and 7, elements 26 and 54 both have thicknesses of material in their radial dimensions that are less than—not greater than—the widths in their axial dimensions.  And the specification expressly refers to elements 26 and 54 as a "band" multiple times.  (Exh. A, 3:49, 3:59, 3:64, 3:66, 4:4, 4:15, 4:29, 4:32, 4:34, 4:41, 4:44).

Defendants' position prompts several inescapable questions:  If the patentee had desired to redefine the term "band" to require a thickness of material in the radial dimension that is *greater* than the width in the axial dimension, then why would the patentee have provided three drawings that show just the opposite?  Why would the patentee have expressly referred to elements 26 and 54 in those drawings as a "band" over twenty times?  And why would the patentee have referred to the devices shown in these Figures as "an embodiment of the invention"?  In light of these facts and Mr. Montena's testimony, the possibility that the patentee desired to redefine the term "band" as the Defendants suggest is wildly implausible.  At the very least, it cannot be said that the patentee did so with "reasonable clarity, deliberateness, and precision."  *Paulsen*, 30 F.3d at 1480.  This conclusion is consistent with the case law, which reasons that if an interpretation causes the claims of a patent to fail to encompass any of the embodiments

disclosed in the patent, the interpretation is "rarely, if ever, correct." *Johns Hopkins*, 152 F.3d at 1355.[4]

> **c)    Additional Portions of the Specification, As Well As The Prosecution History, Demonstrate That The Interpretation Argued By Defendants Is Incorrect**

Additional portions of the specification, as well as the prosecution history, confirm that the interpretation now argued by Defendants is incorrect. Not only does Defendants' proposed interpretation of "band" exclude all of the disclosed embodiments of the '416 patent, but it also runs counter to the objectives taught by the specification to be achieved through the compression, and resulting deformation, of the band. The '416 patent teaches that when compressed, the elastomeric material of the band deforms and pushes against the cable, creating a weather-tight seal and providing retention force to the cable/connector combination. (Exh. A, 2:67-3:6, 3:63-4:1). The weather-tight seal and the retention force are both enhanced when the band is in the shape shown in the Figures of the patent, with less thickness of material in the radial direction than width in the axial direction. (Eldering Decl., ¶ 9). In that configuration, there is

---

[4] In response to PPC's motion for a preliminary injunction, Defendants argued that the drawings and the text conflicted with one another and that the text should control. (Dkt. No. 65, p. 18). But as seen above, there is only a single word in the text that could be *argued* to conflict with the drawings. The rest of the text is fully consistent with the drawings; indeed, the drawings and the text are consistently interwoven with one another. Thus, this is not a case in which drawings are controlling over text, but a case in which the entirety of the drawings and text are controlling over a single word of text.

necessarily more deformation and greater contact area between the deformed band and the cable. (*Id.*). On the other hand, if the band is in the shape of a washer, the compressive force is distributed over a greater area, reducing deformation. (*Id*.). The contact area between the deformed band and the cable is also reduced, both because there is less deformation and a smaller potential contact area between the band and the cable from the outset. (*Id*.). This necessarily reduces the sealing effect and the retention force, sacrificing some of the most important advantages of using bands like those disclosed in the figures. (*Id*.).

The prosecution history provides additional evidence rebutting Defendants' interpretation. During prosecution of the '416 patent, the patent examiner, unmotivated by litigation, had no difficulty understanding that the phrase "elastomeric band" as used in the claims encompasses a band with a configuration as shown in the figures. In rejecting the claims, the examiner concluded that ring 40 disclosed in the Hung patent was an "elastomeric band" as claimed in the '416 patent application. (Exh. G, Office Action dated May 25, 2005 at 000156 (" . . . Hung discloses . . . an elastomeric band 40 . . . .")). As shown below, "elastomeric band 40" of Hung is shaped like the band shown in the figures of the '416 patent, with the thickness of material in the radial dimension being less than the width in the axial dimension:

16



FIG. 2B

(Exh. K, U.S. Patent No. 6,767,248).  The examiner thus construed the phrase "elastomeric band" consistently with the figures in the '416 patent.  Hung was later determined not to be prior art, but the examiner's view that the elastomeric band 40 of Hung is the claimed "elastomeric band" is still relevant to understanding what a person of ordinary skill in the art would understand the phrase to mean, and the examiner's finding directly contradicts Defendants' interpretation.[5]

Given all the foregoing, the intrinsic evidence clearly demonstrates that the patentee did not redefine the term "band" as Defendants argue.  Indeed, this case is even more open-and-shut than *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356 (Fed. Cir. 1999) and *Merck & Co. v. Teva Pharmaceuticals USA*, 395 F.3d 1364 (Fed. Cir. 2005) in which the Federal Circuit rejected arguments that the patentee had acted

---

[5] The examiner also found that element 70 of the Siebelist reference, shaped like the elastomeric band shown in the figures of the '416 patent, was also an "elastomeric band."  (Exh. H, Office Action dated November 3, 2005).

as its own lexicographer.  In *K-2*, an "unaccustomed meaning" was urged for a claim term, but the Federal Circuit rejected the definition because there was "so little support in the intrinsic record."  191 F.3d at 1364.  The proposed definition "[did] not appear with the required clarity, deliberateness, and precision to impart an unaccustomed meaning to an otherwise clear claim term."  *Id.*  Likewise, in *Merck*, the definition urged was "counterintuitive" and the patent was sufficiently ambiguous that it "fail[ed] to redefine [the term]…in clear enough terms to justify such a counterintuitive definition."  395 F.3d at 1370.  Here, Defendants' interpretation collapses under the weight of the plain meaning of the claim term and the overwhelming intrinsic evidence confirming the plain meaning.  The single sentence on which Defendants rely is simply insufficient to justify such an "unaccustomed" and "counterintuitive" definition of "band."  Because the interpretation argued by Defendants is incorrect, their assertion of non-infringement also is incorrect.

### 2.  Even Under Defendants' Stated Interpretation For The Shape Of The "Band," There Is Literal Infringement

Even if Defendants' stated interpretation for the shape of the "band" is adopted, there is still literal infringement.  Defendants state that their interpretation is as follows: "A strip of elastomeric material that has a width greater than its thickness, with the width being in the radial direction…."  (D.Mem. 10).  Defendants' arguments for non-infringement assume that the phrase "width…in

18

the radial direction" refers to the thickness of material in the radial direction, but the phrase as used by Defendants just as easily refers to the size of the radius itself. In this way, Defendants' ring does have a "width…in the radial direction" that is greater than its thickness in the axial direction. According to Defendants' own design drawings (filed under seal), the inner radius of Defendants' band and the outer radius of their band are both greater than the axial dimension of Defendants' ring. (D.Mem. 4). Thus, even under Defendants' stated interpretation for the shape of the "band," there is literal infringement.

### B. The Presence Of A Small Protrusion On The Edge of Defendants' Band Does Not Demonstrate Non-Infringement, Let Alone Justify Summary Judgment Of Non-Infringement

Defendants next argue that even under PPC's proposed construction, there is no infringement. Specifically, Defendants argue that PPC defines a "band" to comprise a "flat strip." Defendants then argue that their band is not a "flat strip" because it has a small protrusion on one edge of the band. (D.Mem. 11-13).

Defendants are reading too much into the word "flat." Defendants pretend as if the word "flat" has only one "widely accepted meaning," and that the term means entirely "smooth." (D.Mem. 12). But the term "flat" has a much broader meaning. And the focus in claim construction must be on "how the patentee used the claim term." *Phillips*, 415 F.3d at 1321. The only place in the entire patent in which the term "flat" is used is in one of the sentences already discussed above.

19

That sentence shows that the phrase "flat strip" is simply meant to refer to a strip whose width is greater than its thickness. The specification states: "'Band' is used in the sense of a flat strip, i.e., the width is greater than the thickness." (Exh. A, 2:40-41). This sentence defines "flat strip" to mean a strip that has a width that is greater than its thickness.

This is one of the normal and accepted meanings of the word "flat." If there were any need to confirm this, the dictionary definitions do so:

- "3. Having a relatively broad surface in relation to its thickness or depth: a flat board." Exh. B, *The American Heritage Dictionary of the English Language* (4th ed. 2000).

- "5a. having the major surfaces essentially parallel and distinctly greater than the minor surfaces <a ~piece of wood>" Exh. F, *Merriam-Websters Collegiate Dictionary* (10th ed. 1998).

It is abundantly clear that the band in Defendants' products comprises a "flat strip" in this sense of the word (Eldering Decl., ¶ 7), and this is the sense in which the word "flat" is used in PPC's proposed interpretation. Thus, summary judgment of non-infringement is completely inappropriate.

Even if the word "flat" in the phrase "flat strip" means "smooth," Defendants still do not prevail. As the dictionary definitions make clear, there is nothing in the term "flat" that requires *all* surfaces of the Defendants' band to be smooth, only *one* surface has to be smooth:

- "2. Having *__a__* smooth, even, level surface: a skirt sewed with fine flat seams."  Exh. B, *The American Heritage Dictionary of the English Language* (4th ed. 2000) (emphasis added).

- "3. Having *__a__* surface that is without marked projections or depressions." Exh. C, *Random House Webster's College Dictionary* (2d ed. 1997) (emphasis added).

- "1. having *__a__* smooth, level surface."  Exh. E, *Webster's New World Dictionary and Thesaurus* (2d ed. 2002) (emphasis added).

- "3. having *__a__* relatively smooth or even surface."  Exh. F, *Merriam-Websters Collegiate Dictionary* (10th ed. 1998) (emphasis added).

Thus, even if the term "flat" means "smooth," Defendants' band comprises a "flat strip" because Defendants' band clearly has at least one smooth surface. (Eldering Decl., ¶ 7).  At the very least, there are genuine issues as to whether Defendants' band comprises a "flat strip," and summary judgment of non-infringement is inappropriate.

Finally, even if the term "flat" somehow implies that all surfaces must be smooth, as Defendants argue, there are still genuine issues as to whether the Defendants' band qualifies as a "band" under the doctrine of equivalents.  As can be seen in the enlarged photograph provided several pages above, the protrusion is only a *de minimis* portion of the surface area of the Defendants' band.  Indeed, the evidence shows that the protrusion on which Defendants rely affects less than 10% of the surface area of the band.  (Eldering Decl., ¶ 7).  Furthermore, the protrusion does not affect the ability of the band to form a weather-tight seal or to provide a

21

retention force.  (*Id.*).  Thus, the protrusion is at most an insubstantial difference

from a band that is perfectly smooth on all surfaces.  At the very least, there are

genuine issues as to infringement under the doctrine of equivalents.

Defendants argue that PPC is precluded from relying on the doctrine of

equivalents because the specification disavowed coverage of an O-ring.  (D.Mem.

17).  But Defendants are not using an O-ring, and therefore disavowal of an O-ring

does not preclude coverage of Defendants' band either literally or under the

doctrine of equivalents.  Neither the specification nor the prosecution history

disavows a strip with a *de minimis* curved surface on one edge of the strip.  The

motion for summary judgment must be denied.[6]

## III.  SUMMARY JUDGMENT IN FAVOR OF DEFENDANTS ON THE ISSUE OF TRADE DRESS INFRINGEMENT WOULD BE IMPROPER

"Trade dress is the total image of a product, the overall impression created,

not the individual features."  *Aromatique, Inc. v. Gold Seal, Inc.*, 28 F.3d 863, 868

(8th Cir. 1994).  Trade dress can include combinations of elements such as shape,

---

[6] Defendants argue that PPC is precluded from relying on the doctrine of equivalents altogether because there is no specific theory of equivalence in PPC's Claim Chart.  (D.Mem. 14).  But PPC's Claim Chart clearly demonstrated why there is literal infringement and reserved the right to proceed under the doctrine of equivalents if PPC's claim interpretation is not adopted.  (Exh. I, p. 2).  PPC could not have been expected to set out a specific theory of equivalence to account for every contingency.

size, texture, color or even color combinations. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 765 n. 1, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). The trade dress at issue in this case is the combination of elements comprising the overall appearance of PPC's EX6 connectors (below). These elements include, at least, a black plastic center portion, placed between top and bottom metallic portions with a silver-colored finish ("EX trade dress") (Montena Decl., ¶ 9; Eldering Decl., ¶ 17).

          

**EX6 Compressed**          **EX6 Uncompressed**        **50-Count Bag of EX6 Connectors**

Despite an almost limitless number of alternative design choices, Defendants chose to copy the appearance of PPC's EX connectors. (In both photographs below, Defendants' connectors are the four connectors at the left with four EX connectors at the right).

23





24

Indeed, Defendants are becoming more adept at copying the EX trade dress. Just two days ago PPC discovered Perfect 10 Ridgeloc connectors sold to DIRECTV with the Perfect 10's logo "Perfect Vision" *removed*. (Declaration of Alan Williams ("Williams Decl."), ¶¶ 4, 7-8 and attached photographs). What's more troubling is that these facts are in direct contravention to Perfect 10's President's sworn testimony to this Court in support of the present motion. (Chastain Decl. ¶¶ 11,13, Dkt. No. 112). These connectors not only copy PPC's trade dress, but they have been actually confused by DIRECTV installers as PPC EX connector. *Id.*, ¶¶ 5-6. Because DIRECTV installers have complained about the poor quality of these connectors, this actual confusion is of great concern to PPC.

Despite their copying, Defendants argue that the Court should enter final judgment that PPC can *never* have a protectable trade dress for its EX connectors. This argument is based entirely on the existence of PPC's U.S. Patent No. 6,558,194 ("the '194 patent"). Defendants fail, however, to acknowledge a seminal fact: Even though Defendants copied the appearance of PPC's EX6 connector, PPC does not accuse it of infringing the '194 patent. In other words, Defendants' own connector provides strong evidence that even a connector carefully designed to copy the outward appearance of the EX connector can still not practice the '194 patent. Moreover, Defendants' choice to copy the appearance

25

of the EX connector, rather than the myriad of other design choices, provides strong evidence that the EX trade dress is not functional.  Finally, before the Court can make a determination that the '194 patent is evidence of functionality, the "central advance" of the patent must be identified and shown to correspond to the "essential features" of the claim trade dress.   Defendants do not even address this necessary step.   PPC, on the other hand, has provided expert testimony that the "central advance" of the '194 patent does not cover the EX trade dress and that the EX trade dress is not functional.  This evidence defeats Defendants' claim that the EX trade dress is not protectable.

### A.   The '194 Patent Is Not Evidence Of Functional Trade Dress Because The '194 Patent Is Directed To Structure That Is Inside The Connector

Relying on the Supreme Court's decision in *TafFix Devices, Inc. v. Marketing Displays, Inc*., 532 U.S. 23, 121 S.Ct.1255, 149 L.Ed.2d 164 (2001), Defendants contend that the mere existence of the '194 patents prevents  PPC from establishing trade dress protection for the appearance of its EX connectors. Defendants' application of *TafFix* goes too far and is unsupported by critical facts.

The Court in *TrafFix* held that a "utility patent is strong evidence that the features therein claimed are functional." *Id.* at 29.  But the inquiry doesn't end there.  *TafFix* does not prohibit a finding of nonfunctionality in every trade dress case involving a utility patent.  Instead, the Court found the alleged trade dress in

that case was functional because the "central advance" of the patent was an "essential feature" of the utility patent in questions.  In other words, "the Court prohibits affording trade dress protection of the *central advance* of an existing patent." *Leviton Mfg. v. Universal Sec. Inst., Inc.*, 304 F. Supp. 2d 726, 736 (D. Ma. 4004) (emphasis added).

Courts following *TafFix* have recognized this inquiry as part of the *TafFix* test for functionality.  *Berlin Packaging, LLC. v. Stull Techs, Inc.*, 381 F. Supp. 2d 792, 802 (N.D. Ill. 2004) ("Under the Supreme Court [*TafFix*] test, the Court next turns to the question of whether the "essential feature" of the trade dress and the "central advance" claimed in the expired *'778 Patent* overlap.") (italics in original); *Asics Corp. v. Target Corp.*, 282 F. Supp. 2d 1020, 1026 (D. Minn. 2003) ("The Court must examine a utility patent 'closely to ensure that the disclosure of the configuration is primarily functional and not merely incidental.'") (citation omitted); *Franek v. Walmart Stores, Inc.*, 2009 U.S. Dist. LEXIS 20361 at *36 (N.D. Ill. 2009) ("[B]urden will be imposed only if a 'central advance' of the utility patent overlaps with an 'essential feature' of the trade dress or trademark."). Remarkably, however, Defendants made no attempt to identify the central advance of the '194 patent.  They apparently skipped this analysis because they could not identify the central advance of the '194 patent without conceding that it is directed

to the inner workings of a cable connector, and therefore cannot implicate PPC's EX trade dress.

The '194 patent is directed to a "connector and method of operation." More specifically, the inventive features of the '194 patent are directed to the interaction of components inside the connector. (Eldering Decl., ¶ 12). To illustrate, Figures 1 and 5 of the '194 patent are reproduced below:



Fig. 1

28



Fig. 5

The "central advance" of the '194 patent is the interaction between the inner wall of the compression ring 28 and the corresponding connector body 24. The inner wall of the compression ring is tapered in a manner that when the compression ring is slid along the connector body, the tapered portion of the inner wall deforms the connector body inward to form a mechanical grip and a seal against the outer portion of the cable. (*Id.* ¶¶ 12-13; Exh J '194 Patent, at Figure 1 and 6:39-51). This process occurs within the inner portions of the connector and does not involve outwardly visible structures. (Eldering Decl., ¶ 14).

To further illustrate that the central advance of the '194 patent involves non-visible components, Claim 1 of the '194 patent is reproduced below with the inner, non-visible features highlighted:

29

A connector for coupling an end of a coaxial cable to a threaded port, the coaxial cable having a center conductor surrounded by a dielectric, the dielectric being surrounded by a conductive grounding sheath, and the conductive grounding sheath being surrounded by a protective outer jacket, said connector comprising:

a*. a tubular post having a first end adapted to be inserted into an exposed end of the coaxial cable around the dielectric thereof and under the conductive grounding sheath thereof, said tubular post having an opposing second end*;

b. a nut having a first end for *rotatably engaging the second end of said tubular post* and having an opposing second end *with an internally threaded bore for threadedly engaging the threaded port*;

c. a cylindrical body member having a first end and a second end, the first end of said cylindrical body member including a cylindrical sleeve having an outer wall of a first diameter and *an inner wall, the inner wall bounding a first central bore extending about said tubular post, the second end of said cylindrical body member engaging said tubular post proximate the second end thereof, said cylindrical sleeve having an open rear end portion for receiving the outer jacket of the coaxial cable, said open rear end portion being deformable*;

d. a compression ring having first and second opposing ends *and having a central passageway extending therethrough between the first and second ends thereof, the first end of said compression ring having a first nontapered internal bore of a diameter commensurate with the first diameter of the outer wall of said cylindrical sleeve for allowing the first end of said compression ring to extend over the first end of said cylindrical body member, the central passageway of said compression ring including an inwardly tapered annular wall leading from the first internal bore and narrowing to a reduced diameter as compared with the first diameter; and*

e*. said inwardly tapered annular wall causing said rear end portion of said cylindrical sleeve to be deformed inwardly toward said tubular post and against the jacket of the coaxial cable as said*

*compression ring is advanced axially over the cylindrical body
member toward the second end of said cylindrical body member.*

As illustrated, all of the limitations of Claim 1 of the '194 patent are directed to inner workings of the connector. These limitations do not dictate the outward appearance of a connector. (Eldering Decl., ¶ 14). To the extent some of the outward features of a connector are recited at all in the claims (i.e., nut, compression ring, body member) these structures are incidental to the claim, serving only as generic structure to provide context for the actual inventive elements. (*Id.*, ¶ 16).

As a result, the central advance of the '194 patent can be accomplished by a connector that is visually similar to PPC's EX connector but also by many connectors with a wide variety of dissimilar appearances. For example, below (left) is the Holland SLCU connector, which is manufactured pursuant to a license to the '194 patent. Also below (right) is a connector, marketed as DCSOF6U-G-25, which was found to infringe the '194 patent. (*Id.*, ¶ 15.)





**Holland SLCU**                    **DCSOF6U-G-25**

Neither of these connectors practice the EX trade dress but do practice the '194 patent.

Rather than identify the central advance of the '194 patent, Defendants have simply listed a "nut," "cylindrical body," and a "compression ring" as features of the EX connector that appear generally in the claims of the '194 patent.  For the reasons articulated above, these structures do not form the central advance of the '194 patent (or the elements of the EX trade dress for that matter).  In any event, even if these general structures were part of the central advance of the '194 patent, or essential elements of the EX trade dress, a "nut," a "cylindrical body" and a "compression ring" of a connector can have many different aesthetic or design features.  (Eldering Decl., ¶ 16.)

**B.    Evidence Of Record Establishes That The EX Trade Dress Is Not Functional**

"'[A] product feature is functional,' and cannot serve as a trademark, 'if it is essential to the use or purpose of the article or if it affects the cost or quality of the article.'"  *TrafFix*, 121 S.Ct. at 1261 (citations omitted").  Stated differently, "a functional feature is one the 'exclusive use of [which] would put competitors at a significant non-reputational-related disadvantage.'"  *Id*. (citation omitted).  Conversely, "if a competitor can effectively compete without copying a particular feature or combination of features, then the trade dress is nonfunctional." *Rainbow*

32

*Play Sys. Inc. v. Groundscape Tech*., LLC., 364 F. Supp. 2d 1026, 1037 (D. Minn. 2005). The only evidence of record establishes that, applying this standard, the EX trade dress is not functional.

The purpose of a coaxial cable connector is to provide an end to a coaxial cable that can be attached to a device (usually a cable box or TV). The connector should create a strong enough attachment to the cable that the cable and connector do not become easily detached. Also, the inner structures of the connector should contact corresponding layers of the cable in such a way that the clarity of the signal carried by the cable is preserved. (Eldering Decl., ¶ 18).

PPC has submitted testimony from Charles Eldering, Ph.D. that the elements of the EX trade dress are not essential to the purpose of the connector, principally because it is not necessary that the connector have a plastic center portion sandwiched between two silver metallic portions. (Eldering Decl., ¶ 19, 22 and 24). Dr. Eldering's findings are supported by the '194 patent Defendants brought to the Court's attention. Specifically, the '194 patent provides that "[i]n this preferred embodiment, the connector body 24 [center portion] is preferably *formed of brass or copper alloy....*" (Exh. J '194 patent, 6:65-67, 7:1). In other words, the preferred embodiment of the '194 patent is a connector formed entirely of metal. (Eldering Decl., ¶ 19).

Alternative designs may be explored as further evidence of nonfunctionality. Indeed, the availability of alternative designs is a legitimate source of evidence that a feature is nonfunctional. *Valu Engineering v. Rexnard Corp.*, 278 F3d 1268, 1276 (Fed. Cir. 2002); *see also Franek v. WalMart Stores, Inc.*, 2009 U.S. Dist. LEXIS at *49-51(N.D. Ill. 2009) (following *Valu Engineering* reasoning that consideration of alternative designs is probative of functionality). In this instance, there are many connectors on the market that are comprised of all metal or almost all metal, and do not, therefore, use the EX trade dress. Just a few examples are provided below:[7]

                    

**SealTite® connector**       **SuperLok® connector**       **Holland crimp-on connector**

          

**UltraEase® connector**       **F Connector, RG56 Brass**

---

[7] Each of these connectors, except the SealTite® connector, is offered for sale on Defendant P10's own website.

34

Even connectors that are not comprised of all metal can have partial plastic designs without adopting PPC's EX trade dress.  In other words, it is not essential to the purpose of the connector to have the plastic portion in the center, nor is it essential that the plastic portion be black.  Depicted below is PPC's CMP connector (left) and the well known Snap-N-Seal® compression connector manufactured by Thomas & Betts (right):

    

**PPC's CMP**                    **Snap-N-Seal® connectors**

Rather than sandwich plastic between two metal pieces, the CMP and Snap-N-Seal® connectors have metallic top and middle portions with a blue or orange plastic bottom portion.[8]  (Eldering Decl., ¶ 23).  The silver-colored finish of the EX trade dress is also not essential to the use or purpose of the connector.  Coaxial cable connectors having outer metal portions have a variety of metal finishes.  For example, both the Snap-N-Seal® connectors and the RG56 connectors shown above have brass-colored or copper-colored metallic finishes.  This multitude of design alternative is further evidence that PPC's trade dress is not essential to the purpose or use of the connectors.  It follows that these alternatives used by

---

[8] These connectors are also offered for sale on P10's website.

competitors demonstrate that the EX trade dress does not affect the cost or quality of the connectors.  (Eldering Decl., ¶ 25, Montena Decl., ¶ 7).

### C. Because Defendants Have Withheld Evidence Relevant To The Issue Of Functionality, Summary Judgment Should Be Denied

For the purposes of assessing potential functionality, the Eighth Circuit has articulated that "[t]rade dress may also be considered functional if it puts a competitor at a significant non-reputation-related disadvantage. *Gateway, Inc. v. Champion Prods., Inc.*, 384 F.3d 503, 508 (8th Cir. 2004).  In support of its decision to affirm the district court's findings, the court of appeals considered evidence that the defendant's product was "actually created with Gateway in mind." *Id* at 509.  As such, Defendants' motive for choosing to copy PPC's EX connectors, rather than one of the many design choices available to them, is relevant to a determination of functionality.  Defendants have, to this point, avoided providing any evidence concerning their decision to adopt a connector design that copies the EX connectors.  Moreover, Defendants were aware of PPC's EX trade dress before they designed the accused connectors.  Inferring all facts in a light most favorable to PPC in connection with a summary judgment motion, the Court should conclude that Defendants copied the EX trade dress to confuse purchasers that their connectors were, in fact, EX connectors.  At the very least, until a full record is developed on this and other relevant issues, entering summary judgment now is inappropriate.

In addition to evidence of intentional copying, Defendants have refused to provide discovery about other design alternatives that were available to them or that were actually considered when they designed the accused connectors. For the reasons articulated above, such an inquiry is critically relevant to a determination of functionality. Without providing PPC an opportunity to review relevant documents or depose the designers of the accused connectors, entry of summary judgment of functionality would be premature.

## IV.    DEFENDANTS' MOTION IS PREMATURE, AND PPC REQUESTS RELIEF UNDER FED.R.CIV.P. 56(f)

Defendants' motion for summary judgment is premature. Neither party has had the opportunity to take a single deposition of any witness, and the parties are both still in the process of completing their document productions. Fact discovery has not yet closed. The Court has not yet set a hearing date or a briefing schedule for claim construction. Thus, neither PPC nor its experts have had an opportunity to apply the Court's claim constructions. The close of expert discovery is still several months away.

PPC brought this action last January. Shortly after filing, PPC sought a preliminary injunction against Defendants, based on the probability of patent infringement. Defendants successfully resisted the preliminary injunction, arguing, *inter alia*, that too many factual disputes existed for PPC to sustain the onerous evidentiary burdens necessary for a preliminary injunction. The Court denied the

37

motion, stating that "there are genuine disputes as to claim construction and literal infringement" and that the parties should have "an adequate opportunity to present a full picture of the claimed invention and the prior art" before the Court could assess a likelihood of success on the merits. (Dkt. No. 99 ("PI Order")).

Now, without the Court's claim construction and with essentially no more facts available to PPC than when the Court made its findings in the PI Order, Defendants have made an about-face. Defendants now contend that no genuine issues of fact exist, no discovery or formal claim construction is necessary, and that they are entitled to summary judgment on all claims—including the highly factual issue of functionality related to PPC's EX connector trade dress. These positions are irreconcilable and, on that basis alone, Defendants' summary judgment motion should be denied.[9]

It is well established, in the Eighth Circuit and elsewhere, that "summary judgment is proper only after the nonmovant has had adequate time to engage in discovery." *Stanback v. Best Diversified Prods., Inc.*, 180 F.3d 903, 911 (8th Cir. 1999); *In re TMJ Implants Prods. Liab. Litig.*, 113 F.3d 1484, 1490 (8th Cir. 1997); *Robinson v. Terex Corp.*, 439 F.3d 465, 467 (8th Cir. 2008); *accord, e.g.*, *Nolan v. Thompson*, 521 F.3d 983, 986 (8th Cir. 2008). When faced with a motion

---

[9] These arguments framed the basis for PPC successful opposition to Defendant's Motion to Stay Discovery. See Order Denying Motion to Stay Discovery (Dkt. 125).

for summary judgment, a party claiming that it has not had adequate opportunity to take discovery may file an affidavit under Federal Rule of Civil Procedure 56(f), showing "what specific facts further discovery might unveil." *Stanback*, 180 F.3d at 911. The Eighth Circuit has held that "[t]he purpose of subdivision (f) is to provide an additional safeguard against an improvident or premature grant of summary judgment…and [the rule] should be applied with a spirit of liberality." *United States v. Casino Magic Corp*, 293 F.3d 419, 426 (8th Cir. 2002). The contemporaneously filed Declaration of C.J. Veverka ("Veverka Decl.") complies with Federal Rule of Civil Procedure 56(f).

Courts have found summary judgment motions brought before the close of discovery to be premature. *See City of Rome v. U.S.*, 450 F.Supp. 378, 384 (D.C. D.C. 1978). There is certainly no bar to bringing a motion prior to the close of discovery, but the discovery period itself is some indicia of what can reasonably be accomplished and parties should be able to pace and coordinate their efforts within the pre-existing parameters set by agreement amongst the Court and parties. Defendants' summary judgment motion is premature because PPC has not had adequate opportunity to take discovery on the issues presented in Defendants' present motion.

A simple review of the facts identified as being "undisputed" in Defendants' motion highlights potentially material issues for which discovery is warranted.

Each of those "undisputed facts" are summarized below, followed by an explanation of the issues that need to be resolved in discovery in order for PPC to fully respond to them:

DEFENDANTS' "UNDISPUTED FACT" NOS. 4-6: Citing to the Chastain Declaration, Defendants assert that "Perfect 10 designed the accused connectors," that the Pace and Perfect 10 connectors are "structurally identical," and that "[t]he only differences between the two connectors relate to their external appearance." (D.Mem. 4).

UNRESOLVED ISSUES IN DISCOVERY: Defendants have not completed their document production nor have they allowed deposition discovery of any witness, including Robert Chastain, the sole declarant in the present motion. Thus, PPC has not had the opportunity to cross-examine Mr. Chastain or depose any of the other of the multiple witnesses Defendants have identified as having knowledge of the design, manufacture, and functioning of Defendants' accused connectors. Indeed, PPC has just learned that Defendant Perfect 10 has changed the design of its Ridgeloc connectors to appear even more like the EX trade dress and removed its trade name "Perfect Vision." This is in direct contravention to Mr. Chastain's sworn statement. (See Chastain Decl. ¶ 11 and 13, Dkt 112). As such, PPC cannot confirm the truth or falsity of these asserted "undisputed facts." Mr. Chastain's deposition has been noticed, but it has not yet been permitted by

Defendants.  Completion of fact discovery, including the noticed deposition of Mr. Chastain, may well provide evidence refuting these asserted undisputed fact.

DEFENDANTS' "UNDISPUTED FACT" NOS. 7-12:  Citing to the Chastain Declaration, Defendants assert that all the accused Pace and Perfect 10 connectors have a band that is "made of silicon rubber," that the band has a particular configuration with asserted dimensions, including a band that has a "protrusion" so that "in one cross-sectional view, it is shaped like the state of Nebraska," and that the bands in all of the accused connectors have this same configuration and these same dimensions.  (D.Mem. 4).

UNRESOLVED ISSUES IN DISCOVERY:  As noted above, Defendants have not completed their document production nor have they allowed deposition discovery of the declarant, Robert Chastain, or any of the other witnesses Defendants have identified as having knowledge of the design, manufacture, and functioning of Defendants' accused connectors.  As such, PPC cannot confirm the truth or falsity of these asserted "undisputed facts."  For example, PPC cannot confirm that all connectors manufactured and sold by Defendants are the same and have a band with the protrusion described in Defendants' papers.  Moreover, Defendants continue to change the design of their connectors.  (Williams Decl., ¶¶ 4,7,8).  This presents a factual "moving target" that only discovery can nail down.

41

Completion of fact discovery, including the noticed deposition of at least Mr. Chastain, may well provide evidence refuting these asserted undisputed facts.

DEFENDANTS' "UNDISPUTED FACT" NOS. 13-14:  Defendants assert that PPC has failed to identify "any aspect of the external appearance of the EX connector" that constitute "arbitrary embellishments."  (D.Mem. 5).

UNRESOLVED ISSUES IN DISCOVERY:  As noted above, Defendants have not completed their document production nor have they allowed deposition discovery of any of the Defendants' employees.  The image of PPC's connector provided with PPC's Complaint distinctly shows the arbitrary, unique and distinctive embellishments that include a black plastic center portion sandwiched between top and bottom metallic portions each with a silver-colored finish. Completion of fact discovery, including the depositions of Defendants' employees, may well provide evidence that Defendants recognized the arbitrary, unique, and distinctive embellishments that constitute the trade dress of PPC's EX connector and copied them to trade on PPC's goodwill and cause confusion among consumers.  The design of Perfect 10's new connectors suggest this is the case. (*Id.*).  Discovery may show that Defendants contemplated other designs that did not incorporate PPC's trade dress, demonstrating that PPC's trade dress is not "functional."  Despite PPC's request, there has not yet been any deposition discovery regarding Defendants' "design" of the accused connectors.  Indeed, PPC

42

has just learned that Defendants have changed the design of their connectors to even more closely copy PPC EX connectors. (*Id.*).  Information about Defendants' process for creating this new design may show that PPC contemplated other designs that did not incorporate PPC's trade dress, demonstrating that PPC's trade dress is not "functional."

DEFENDANTS' "UNDISPUTED FACT" NOS. 15-18:  Defendants assert that the EX connector satisfies two claims of the '194 patent and that the overall appearance of the EX connector consists of nothing more than elements required by the claims of the '194 patent.  (D.Mem. 6).

UNRESOLVED ISSUES IN DISCOVERY:  As noted above, Defendants have not completed their document production nor have they allowed deposition discovery of any of Defendants' employees.  The image of PPC's connector provided with PPC's Complaint distinctly shows the arbitrary, unique and distinctive embellishments that include a black plastic center portion sandwiched between top and bottom metallic portions each with a silver-colored finish.  It is clear that these features are not the "central advance" of the '194 patent.  Completion of fact discovery, including the depositions of Defendants' employees, may well provide evidence that Defendants knew about the '194 patent, had an understanding about the "central advance" of that patent, and had an understanding that the arbitrary, unique, and distinctive embellishments that constitute the trade

43

dress of PPC's EX connector do not overlap with the "central advance" of the '194 patent. Discovery may also provide evidence that Defendants recognized the arbitrary, unique, and distinctive embellishments that constitute the trade dress of PPC's EX connector and copied them to trade on PPC's goodwill and cause confusion among consumers. There has not yet been any deposition discovery regarding Defendants' "design" of the accused connectors or discovery regarding Defendants' knowledge and understanding of the '194 patent.

For all of the foregoing reasons, Defendants' motion for summary judgment is, at best premature. Completion of discovery will shed invaluable light on the issues that Defendants now contend are ripe for summary adjudication. PPC therefore respectfully requests that the Court either (a) deny the motion without prejudice or (b) at least continue the hearing on the motion either until at least fourteen (14) days after the close of expert discovery, or, in the alternative, until at least the Court has been adequately briefed on claim construction and provided the opportunity to construe the terms of the asserted claims.

## V.    CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment should be denied.  Alternatively, the motion should at least be continued.

DATED this 12th day of November 2010.

WORKMAN NYDEGGER

By  /s/ Robert E. Aycock
Sterling A. Brennan (admitted *pro hac vice*)
C. J. Veverka (admitted *pro hac vice*)
Robert E. Aycock (admitted *pro hac vice*)
WORKMAN NYDEGGER, P.C.
1000 Eagle Gate Tower
60 East South Temple
Salt Lake City, UT 84010
Telephone: 801-533-9800
Facsimile: 801-328-1707
sbrennan@wnlaw.com
cveverka@wnlaw.com
raycock@wnlaw.com

Michael E. Florey (#214322)
David A. Gerasimow (#0389309)
FISH & RICHARDSON, P.C.
3200 RBC Plaza
60 South Sixth Street
Minneapolis, MN 55402
Telephone: 612-335-5070
Facsimile: 612-288-9696
florey@fr.com
gerasimow@fr.com
Attorneys for PPC and
John Mezzalingua Associates Inc.

45