UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

John Mezzalingua Associates, Inc.
(d/b/a PPC), a Delaware corporation,

       Plaintiff,

v.                                   MEMORANDUM OPINION
                                       AND ORDER
                                       Civil No. 10-64 (MJD/JJG)

Pace Electronics, Inc.
(d/b/a Pace International)
a Minnesota corporation,

       Defendant,
and

Perfect 10 Antenna Company,
an Arkansas corporation,

       Defendant.
_____

       Sterling A. Brennan, C.J. Veverka and Robert E. Aycock, Workman Nydegger, P.C. and Jeanette M. Bazis and Robert J. Gilbertson, Greene Espel P.L.L.P., Counsel for Plaintiff.

       Ronald J. Schutz, Mathew J. Yang and Brock J. Specht, Robins, Kaplan, Miller & Ciresi, LLP and Charles Darwin "Skip" Davidson and Robert E. Fahr, Jr., Davidson Law Firm and Brian Y. Boyd and John R. Horvack, Jr., Carmody & Torrance LLP, Counsel for Defendants.
_____

       This matter is before the Court upon Defendants' Motion for Summary

1

Judgment [Doc . No. 108].

## I. Factual Background

Plaintiff John Mezzalingua Associates, Inc., d/b/a PPC, Inc. ("PPC") has developed coaxial cable connectors that are covered by various patents. One of PPC's patents is United States Patent No. 7,118,416 ("the '416 patent") which describes a coaxial cable connector with an elastomeric band. (Declaration of Robert Aycock, Ex. A.)

PPC asserts that the '416 patent embodies a novel design for a compression connector. The unique feature of this design is an elastomeric band that is positioned inside the connector, which deforms to provide a waterproof seal when it is compressed. Each of the asserted claims contains as an element the "elastomeric band." For example, claim 1 reads as follows:

> 1. A connector for a coaxial cable, comprising:
>    a connector body;
>    a fastening member for connecting said connector to an object;
>    a post including a barbed portion, said post fitted at least partially inside said connector body for receiving a prepared end of said cable;
>    a compression member fitted to said connector body radially outward of the barbed portion of the post; and
>    a elastomeric band fitted inside a cavity formed at least in part by said compression member;
>    wherein axial movement of said compression member onto said

connector body causes said elastomeric band to deform and seal an outer layer of said cable to said connector to isolate an inside of said connector from environmental influences.

PPC asserts that two years ago, DirecTV agreed to purchase its requirements of "F" type universal coaxial cable connectors directly and exclusively from PPC. (Id. ¶ 11.) Prior to that time, Defendant Perfect 10 Antenna Company ("Perfect 10") supplied DirecTV and its installers with satellite-related products, including PPC's connectors. (Id. ¶ 10.) PPC asserts that it learned that Perfect 10 began selling its own "F" type universal coaxial cable connector and at a lower cost than PPC's. (White Decl. ¶ 16.) DirecTV has indicated to PPC that it is willing to take the risk of trying a lower cost connector. (Id. ¶ 15.) In response, PPC agreed to lower the price of its connectors by one cent per unit, and to provide training services to DirecTV installers. (Id. ¶ 18.) Such price reduction results in a loss of approximately $1.35 million in revenue. (Id.) If DirecTV chooses to purchase its connectors from Perfect 10, PPC asserts that it will suffer lost profits and that Perfect 10's sales may have a ripple effect on PPC's ability to expand its sales of other products to DirecTV. (Id. ¶ 20.)

Defendant Pace Electronics, Inc., d/b/a Pace International ("Pace") is a reseller of DISH Network's satellite television services and a DISH Network retail

partner. (Id. ¶ 24 (Doc. No. 25).) PPC is one of two suppliers that sell coaxial cable connectors to DISH Network's internal technical work force. (Id. ¶ 31.) PPC has also acquired 100% of the market share of DISH Network's outside regional service providers. (Id. ¶ 32.) PPC asserts that it became aware that Pace is attempting to supply DISH Network with a cheaper, infringing alternative to the PPC cable connectors that DISH Network and its installers had been utilizing. The connector being sold by Perfect 10 and Pace are identical, except for cosmetic appearance. (Declaration of Robert Chastain ¶ 9.)

PPC alleges that Defendants' cable connectors infringe claims 1, 4, 5, 8 and 11 of the '416 patent. PPC also alleges that Defendants' use of PPC's EX Connector Trade Dress in its own products is deceptive and likely to cause mistake and confusion as to whether Defendants' products are sponsored or approved of by PPC.

## II.     Standard for Summary Judgment

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The party seeking

summary judgment bears the burden of showing that there is no disputed issue of material fact.  Celotex, 477 U.S. at 323.  This burden can be met "by 'showing' - that is, pointing out to the district court - that there is an absence of evidence to support the nonmoving party's case."  Id. at 325.  The party opposing summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial.  Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

III.   Analysis

   A.   Infringement Claim

To succeed on its claims of patent infringement, PPC must demonstrate that the '416 patent is valid and that it is infringed.  Amazon.com, Inc. v. Barnesandnoble.com, Inc., 239 F.3d 1343, 1350 (Fed. Cir. 2001).

The determination of patent infringement involves a two step analysis.  Transclean Corp. v. Bridgewood Serv., Inc., 290 F.3d 1364, 1370 (Fed. Cir. 2002).  The Court must first determine the scope and meaning of the patent claims asserted.  Id.  Next, the Court compares the properly construed claims against the accused device.  Id.  Claim construction is a matter of law, while infringement involves questions of fact.  Id.

### 1. Claim Construction

Words in a claim are generally given their ordinary and customary meaning as to one skilled in the art at the time of the invention. Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005). "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." Id. at 1314. When the ordinary and customary meaning of claim language is not readily apparent, however, the Court must look to "those sources available to the public that show what a person of a skill in the art would have understood disputed claim language to mean." Id. (citation omitted). Such sources include the words of the claims themselves, the specification, the prosecution history and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art. Id.

While a claim must be read in view of the specification, the Court cannot read a limitation into a claim based on the specification. Renishaw PLC v. Marposs Societa' Per Azioni, 158 F.3d 1243, 1249 (Fed. Cir. 1998) (citing Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir.1996); Markman v.

Westview Instruments, Inc., 52 F.3d 967, 979-80 (Fed. Cir.1995) (en banc), aff'd, 517 U.S. 370 (1996)).  The same is true with regard to the prosecution history, which can be used to understand the claim, but not to enlarge, diminish or vary the limitations in the claim.  Markman, 52 F.3d at 980.  Similarly, extrinsic evidence, such as inventor or expert testimony, dictionaries and treatises, cannot be used to vary or contradict the terms of the claims.  Id. at 981.  Extrinsic evidence should be used only to assist the Court in understanding the patent, not to vary or contradict terms of the claims.  Id.

Finally, a patentee is free to be his own lexicographer, but any special definition given to a word must be clearly defined in the specification.  Id.

### 2. Elastomeric Band

The parties dispute the definition of elastomeric band.

**Defendants' Proposed Construction:**

A strip of elastomeric material that has a width greater than its thickness, with the width being in the radial direction.  The strip is flat, i.e., its surfaces are smooth, even and level without protrusions.

**PPC's Proposed Construction:**

A thin, flat and encircling strip of elastomeric material that has a width greater than its thickness.  The "width" of an elastomeric band extends along the axial direction of the connector.  The "thickness" of the

elastomeric band extends in the radial direction of the connector.

(Doc. No. 102 at 8.)

Defendants argue that they are entitled to summary judgment on PPC's infringement claim because its connectors do not contain an elastomeric band as defined in the '416 patent. It is Defendants' position that elastomeric band should not be given its ordinary meaning because this term is specifically defined in the '416 specification.

> An elastomeric band **26** is disposed within a cavity formed in part by a shoulder **34** of compression nut **16**. "Band" is used in the sense of a flat strip, i.e., the width is greater than the thickness. (The "length" would be the circumference of the band, with the width being in the radial direction.) An O-ring is not considered a band and would not work as a replacement for the band of the present invention.

(2:38-45.)

Defendants argue that PPC cannot avoid the definitions that are included in the specification. Phillips, 415 F.3d at 1316 (where the specification includes a special definition, the inventor's lexicography governs). The fact that the word "band" is included in quotations marks indicates an intent to define. Sinorgchem Co. v. Int'l Trade Comm'n, 511 F.3d 1132, 1136 (Fed. Cir. 2007). Use of "i.e.", for example, signals an intent to define a word, and the Court should construe the disputed term according to that definition. Edward Lifesciences LLC v. Cook,

8

Inc., 582 F.3d 1322, 1334 (Fed. Cir. 2007). Here, the specification specifically defines "band" as a flat strip having a width greater than thickness, with width being in the radial direction. That the band must be a flat strip is further reinforced by the language in the specification which excludes an O-ring. Finally, because the specification specifically provides that the longer dimension is in the radial direction, such definition controls. See Sinorgchem Co., 511 F.3d at 1137-38; Multiform Desiccants, Inc. v. Medzam, Ltd., 133 F.3d 1473, 1478 (Fed. Cir. 1998) (finding that where the specification defines a term without ambiguity or incompleteness, such definition controls).

In response, PPC argues that if elastomeric band is construed as proposed by Defendants, none of the embodiments disclosed in the '416 patent fall within the scope of such claim term, and the elastomeric band takes on the dimensions of a thin rubber washer. By contrast, if the Court adopts its proposed construction, all of the embodiments disclosed will include the elastomeric bands that fall within such construction.

PPC further argues that construing the term elastomeric band to resemble a thin rubber washer is inconsistent with the specification as a whole, and is not sufficiently definite to establish that the patentee defined elastomeric band to

exclude embodiments. <u>Renishaw</u>, 158 F.3d at 1249. While a patentee is free to be his own lexicographer, and is bound by his lexicography, any special definition given to a claim term must be clearly defined. <u>Markman</u>, 52 F.3d at 980. The definition must be sufficiently clear so that one of ordinary skill in the art would deem it to be different from its common meaning. <u>In re Paulsen</u>, 30 F.3d 1475, 1480 (Fed. Cir. 1994).

The parties' dispute centers on which dimension "width" is applied to. To resolve this dispute, the Court must refer to the context in which "width" is used in the specification. The language relied on by Defendants - that the width of the band is greater than the thickness and that the width is in the radial direction - is easily understood when viewed in context. The first use of width clearly refers to a side to side or axial measurement of a flat strip, as it is contrasted with "thickness", while the second use of width refers to a circumferential or radial measurement as it is used in the context of discussing "length" as the circumference of the band.

Requiring the elastomeric band to have a radial width that is greater than the thickness describes a thin washer shape, which shape runs counter to the objectives of the band as taught in the specification - which is when compressed,

the elastomeric material of the band deforms and pushes against the cable, creating a weather-tight seal and providing retention force to the cable/connector combination. ('416 patent, 4:32-36.)

Further, all of the embodiments disclosed in the '416 patent have elastomeric bands that are depicted as having a thickness in the radial dimension that is less than the widths in the axial dimension. (See Figures 1, 4 and 7.) In this case, the Court agrees that if the patentee had desired to define the term "elastomeric band" that has a width greater than its thickness, with the width being in the radial direction, the patentee would have provided a drawing that fit such definition.

Finally, the elastomeric band is compared to a "flat strip." ('416 patent, 2:40-41.) A thin washer shape cannot be laid out to resemble a flat strip. Based on the above, the Court finds that when read in view of the specification as a whole, the claim term elastomeric band does not require a width greater than thickness, the width being in the radial direction.

The Court further finds that there is no requirement that every surface of a "flat strip" be flat. In fact, dictionary definitions of "flat" generally describe one surface that is level or even. (See, e.g., Aycock Decl., Ex. B "3. Having a

relatively broad surface in relation to its thickness or depth: a flat board." The American heritage Dictionary of English Language, (4th ed. 2000); Ex. C "1. horizontally level. 2. level, even, or without unevenness of surface, as land or tabletops. 3. having a surface that is without marked projections." Random House Webster's College Dictionary, (2d. ed. 1997).) Accordingly, to fall within the claim limitations of an elastomeric band, it is not required that all surfaces of the strip be flat.

Based on the above, the Court will adopt the following construction for the term "elastomeric band":

> A thin, flat and encircling strip of elastomeric material that has a width greater than its thickness. The "width" of an elastomeric band extends along the axial direction of the connector. The "thickness" of the elastomeric band extends in the radial direction of the connector.

### 3. Infringement Analysis

Defendants argue they are entitled to summary judgment on PPC's infringement claim because the accused products do not include an elastomeric band as defined in the '416 patent. Specifically, Defendants argue the accused products include an elastomeric band that has one curved surface. (Memorandum in Support of Summary Judgment, p. 12-13.) Further, Defendants argue the elastomeric band in the accused products do not have a radial

dimension that is greater than its axial dimension. The Defendants' arguments of non-infringement no longer have merit as the Court has not adopted the Defendants' proposed construction of "elastomeric band." Rather, the Court has adopted a construction of elastomeric band that does not require that the radial dimension is greater than the axial dimension or that all surfaces must be flat. Accordingly, Defendants have not demonstrated that they are entitled to judgment as a matter of law on the infringement claim.

### B. Trade Dress Claim

In the Complaint, PPC alleges that the appearance, or trade dress, of its EX connectors is unique and distinctive. (Comp. ¶ 17.) PPC asserts that its EX connectors are regarded as top of the line connectors by the industry. (Declaration of Andrew White ¶ 9 (Doc. No. 57).) PPC alleges that Defendants have adopted, imitated and used the EX connector trade dress in connection with their infringing connectors. (Id. ¶ 20, Ex. B (comparing EX connector with infringing connector).)

In an action under the Lanham Act for trade dress infringement, a plaintiff is generally required to prove: (1) that the plaintiff has a protectible interest in its trade dress design, which will be established by evidence that the design (a) is

inherently distinctive or is at least descriptive and has acquired secondary meaning among consumers, and (b) is not functional; and (2) that the defendant's use of a similar trade dress design is likely to cause confusion among consumers as to the source of the parties' goods or services. Gateway, Inc. v. Companion Prod., Inc., 384 F.3d 503, 507 (8th Cir. 2004).

PPC has the burden of proving that the matter sought to be protected is not functional. 15 U.S.C. § 1125(a)(3). An element of trade dress is nonfunctional "if it is an arbitrary embellishment primarily adopted for purposes of identification and individuality." Rainbow Play Sys., Inc. v. Groundscape Tech., LLC, 364 F. Supp.2d 1026, 1037 (D. Minn. 2005) (citations omitted). A feature is functional "if it is essential to the use or purpose of the article or if it affects the costs or quality of the article." TrafFix Devices, Inc. v. Marketing Displays, Inc., 532 U.S. 23, 33 (2001). Also, "a functional feature is one the 'exclusive use of [which] would put competitors at a significant non-reputation-related disadvantage.'" Id. (citation omitted). A prior patent is important in resolving a trade dress claim because a "utility patent is strong evidence that the features therein claimed are functional." Id. at 29.

Defendants argue that PPC cannot meet its burden of proving the external

features of the EX connectors are not functional. PPC has failed to identify any feature that is simply an arbitrary embellishment. Further, the external appearance of the EX connector consists entirely of its functional components: the nut, connector body and compression ring. There can be no question that these components are necessary for the operation of the EX connector. Defendants argue that given the utility for these components, PPC's claim to a monopoly would put competitors at a significant disadvantage. TrafFix, 532 U.S. at 32.

As noted above, a utility patent is strong evidence that the claimed features are functional. PPC owns the '194 patent - an expired utility patent which includes claims that recite the three components of the EX connector. (Boyd Decl, Ex. 7.) At a recent ITC proceeding, PPC established that the EX connector and its components were covered by the '194 patent. (Boyd Decl., Ex. 4, pp.103-05.) Given the administrative record of this ITC proceeding, Defendants argue that PPC is barred from taking a contrary position. Defendants thus argue that PPC has failed to demonstrate that its EX connector is not covered by protectible trade dress and Defendants are entitled to summary judgment.

In response, PPC asserts the appearance of its EX connector is not functional. PPC is not arguing that competitors cannot use the three components

that make up its EX connectors: the nut, the connector body and the compression ring. PPC's trade dress claim is based solely on whether the color scheme and overall impression created by the EX connector is functional.

PPC asserts there are many examples of different designs on the market of a coaxial cable connector that practice the '194 patent. The central advance of the '194 patent is the interaction between the inner wall of the compression ring and the corresponding connector body, and that this central advance can be accomplished by a wide variety of connectors that have an outwardly distinct appearance. (See PPC's Memorandum in Opposition, ps. 31, 34 and 35.) As is clear from the examples provided, some connectors use all metal components, others use metal and plastic. Further, the silver-colored finish of the EX connectors is not essential to its purpose or use. Other connectors have brass finishes or copper finishes.

PPC further argues that Defendants have failed to put forth evidence as to why it chose to design its connectors in such a way as to copy the outward appearance of the EX connector, rather than one of the many other design choices available. PPC argues that at the very least, until a full record is developed on this and other relevant issues, summary judgment is premature.

Because PPC has the burden to prove that the appearance of the EX connectors is not functional, and because discovery was not complete at the time this motion was briefed and argued, the Court finds that Defendants' motion for summary judgment on the trade dress claim is premature.

IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment [Doc. No. 108] is DENIED.

Date: July 22, 2011

s/ Michael J. Davis
Michael J. Davis
Chief Judge
United States District Court